IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Lashun Cureton, | ) | C/A No.: 1:09-2342-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation (Report) pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying her claim for Supplemental Security Income (SSI). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings.

I.      Relevant Background

A.      Procedural History

On February 27, 2006, Plaintiff protectively filed an application for SSI under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381-1383c, claiming disability because of human immunodeficiency virus ("HIV"), peptic ulcers, herpes simplex, and

depression.  Tr. at 117.  Her application was denied initially and on reconsideration.  Tr. at 74–80, 83–84.  On December 15, 2008, an administrative law judge ("ALJ") held a hearing, and on March 16, 2009, the ALJ issued a decision finding Plaintiff not disabled. Tr. at 20–57 (h'rg transcript), Tr. at 11–19 (ALJ decision).  The Appeals Council denied Plaintiff's request for review of the ALJ's decision, which made the ALJ's decision final for purposes of judicial review.  Tr. at 1–4.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 416.1481.

B.    Plaintiff's Background and Medical History

Born in 1971, Plaintiff was 35-years old when she applied for SSI.  Tr. at 93.  She completed high school and has past relevant work as a housekeeper, inspector, and cashier. Tr. at 118, 123, 127, 129–31.

1.    Medical Evidence

Plaintiff was diagnosed as HIV-positive, and on October 10, 2005, her cell count was 176.  Tr. at 229.  February 2006 records from the Greenville Hospital System's Medical Clinic indicate that Plaintiff had "HIV with AIDS-defining criteria," for which she was not taking medication.  Tr. at 195–96.  In April 2006, she began complaining of an intermittent tingling and itching sensation in her extremities.  Tr. at 217.  She re-established care for the HIV, and by June 2006, her cell count had improved to 208.  Tr. at 264.  That summer and fall, Plaintiff complained of joint pain, involuntary twitching of her right arm, hot flashes, heart palpitations, and anxiety.  Tr. at 258, 317.  Physical

examination did not reveal abnormal findings other than hyperactive reflexes in her biceps and kneecap.  Tr. at 258.

> In October 2006, Plaintiff saw David Guirao, M.D., who reported the following:

> HIV/AIDS– discussing the patient's history of non-adherence, she states that she does not have sponsorship for her medications because she was not adherent and the only way she can obtain these medications is by moving to another state. I have ordered a CD4 count and viral load nevertheless. I probably will have to talk to the nurse adherence counselor regarding her case.

Tr. at 352. Records from November 2006 and January 2007 indicated Plaintiff had been noncompliant with HIV treatment.  Tr. at 287, 380.  In December 2006, Dr. Guirao prescribed an antibiotic for the prevention of AIDS-related pneumonia.  Tr. at 433.  In January 2007, he prescribed Lyrica for peripheral neuropathy.  Tr. at 431.

In April 2007, Donald Salmon, Ph.D., performed a psychological evaluation of Plaintiff.  Tr. at 368–73.  She indicated the following symptoms to Dr. Salmon:  increasing fatigue, difficulty focusing, headaches, nausea, vomiting, upper respiratory problems, thyroid problems, and increasing depression and anxiety.  Tr. at 368.  She said she drove "as little as possible" because medication made her drowsy.  Tr. at 368.  She said she had driven to the evaluation, but that she had taken very little pain medication that day and was in more pain than usual.  Tr. at 368.  Dr. Salmon observed that Plaintiff was neatly dressed and groomed; had normal speech and thought processes; was somewhat reserved with a depressed and somewhat anxious mood; had "poor to fair" working memory and "fair" recent and remote memory; had adequate insight and judgment; was fully oriented;

reported transient auditory hallucinations; and denied having suicidal or homicidal ideation, delusions, compulsions, and phobias. Tr. at 368. Dr. Salmon noted Plaintiff's work history was comprised of a "variety of short-term jobs," and that she had moved around between jobs "partly out of boredom." Tr. at 369. Plaintiff indicated that had difficulty dressing, bathing, preparing food, cleaning, driving, and shopping because of pain, drowsiness, and anxiety. Tr. at 372. She expressed reluctance to leave her home, and said her activities consisted of watching television, listening to music, doing yoga, reading poetry, and talking to family members. Tr. at 372. Personality test results indicated Plaintiff was pessimistic, sad, easily irritated, "frequently" suicidal, and had difficulty concentrating. Tr. at 371. Plaintiff's performance on cognitive testing "varied quite widely," which Dr. Salmon attributed to her anxiety level. Tr. at 371. He stated that her "cognitive abilities—particularly in the area of memory and concentration—may be significantly affected by her varying moods of anxiety and depression." Tr. at 372.

In May and June 2007, Plaintiff went to New Horizon Family Health Services ("New Horizon") with complaints of left forearm and hand pain, as well as left hand weakness from neuropathy. Tr. at 386–87, 390–91. She received a prescription for pain medication, but "refused to take" it. Tr. at 386. Other treatment notes indicated Plaintiff had received "[n]o therapy for HIV since 2001," and that she was not taking HIV medication at the time of a June 2007 doctor's visit because she was not "able to get financial help through the local organizations." Tr. at 391, 343. A physician referred her

to a drug assistance program so she could begin taking Atripla, an HIV medication.  Tr. at 387.

In June 2007, Plaintiff went to Greenville Mental Health with complaints of depression and anxiety.  Tr. at 343.  She saw Suril Bhatia, M.D., who indicated that the past three times Plaintiff had been to Greenville Mental Health, her "chart was closed for noncompliance.  She [was] also noncompliant with previous treatment or protocol for HIV."  Tr. at 343.  Dr. Bhatia examined her mental status and found that she had logical, goal-directed thinking; an appropriate "somewhat anxious" affect; "good" insight, judgment, and impulse control; and no cognitive deficits.  Tr. at 343. She denied suicidal or homicidal ideation and delusions, and described her mood as "sometimes sad." Tr. at 343. Dr. Bhatia assessed an unspecified depressive disorder (possibly secondary to illness), and a possible adjustment disorder with mixed disturbance of emotion and conduct.  Tr. at 343.  He prescribed an antidepressant.  Tr. at 343.

In July 2007, Plaintiff stopped taking the AIDS medication Atripla because it made her nauseous.  Tr. at 395.  In September 2007, she was advised to resume taking Atripla and to take anti-nausea medication as well.  Tr. at 399.  On September 26, 2007, Plaintiff went to New Horizon and was prescribed Lyrica for her peripheral neuropathy.  Tr. at 418. In November 2007, she returned to New Horizon and indicated that she had "not started Atripla."  Tr. at 394. In December 2007, Plaintiff complained of numbness and tingling in both hands, but did not want to increase her Lyrica dosage.  Tr. at 418.

An undated progress note from Greenville Mental Health reads as follows:

[Plaintiff was in] a tremendous amount of denial and essentially did not cooperate with treatment here nor with the AIDS Upstate Clinic in taking her antivirals, and was discharged from both clinics. She did this at least twice and unlike the AIDS Upstate, we are going to reopen [her] case here. [She] unfortunately has exhausted AIDS Upstate's willingness to treat her and so she can no longer obtain assistance in getting the antiviral medications through AIDS Upstate, cannot get financial support, get the medications, she can get prescriptions, but has to pay for them herself. She has recently been diagnosed with AIDS and . . . had some infections and a very low CD4 count, and has been reclassified. She has been keeping this information hidden from the people around her . . . there appears to be some aspect of [her] using denial to deal with her situation once again, and not marshaling all of her resources to try to get assistance in getting the antiviral . . . . I think she needs to consider trying a new strategy. She has follow-up appointments with the counselor here. Again, I encouraged her to look for every resource to get support and getting back on her HIV medications as soon as possible.

Tr. at 345.

On December 28, 2007, psychiatrist Michael Woods, M.D., examined Plaintiff and noted that she had been diagnosed with depression, but had dropped out of treatment more than once and had missed other appointments.  Tr. at 400.  Dr. Woods suspected that "noncompliance with treatment has been a clinically significant issue for her. She also . . . has appeared to seek potentially addictive sleeping pills." Tr. at 400. Other than complaining about insomnia affecting her mood, Plaintiff did not clearly specify why she was seeking mental health treatment.  Tr. at 400.  On examination, Dr. Woods found her to be quiet, polite, well-groomed, and mildly depressed and anxious, with "okay" cognition. Tr. at 401.  She reported a compulsive need to check her closets and doors and make everything in her apartment "just right."  Tr. at 401. Dr. Woods prescribed anti-anxiety

and antidepressant medications and strongly encouraged Plaintiff to participate in counseling. Tr. at 401.

In March 2008, Plaintiff went to New Horizon and reported that Lyrica, prescribed for neuropathy, had helped alleviate her depression. Tr. at 416. As of May 2008, Plaintiff indicated to the nurse practitioner at New Horizon that she had no complaints; her numbness was better, and her HIV was "controlled." Tr. at 414.

In September 2008, Plaintiff went to New Horizon for treatment of bronchitis. Tr. at 441. At that time, she also complained of depression and anxiety. Tr. at 441. A September 2008 Greenville Mental Health report indicated that, over the summer of 2008, Plaintiff had "one crisis intervention" and quit taking her psychotropic medications after using them for one month. Tr. at 427. The September 2008 report indicated that Plaintiff had made limited progress because she had switched therapists twice. Tr. at 427. In October 2008, Plaintiff she went to Greenville Mental Health and reported depression, fear, and fatigue. Tr. at 429. Her examiner at the October 21, 2008 appointment noted that she was quiet, cooperative, and "somewhat" anxious; the examiner "strongly recommend[ed]" psychotherapy, but noted that Plaintiff seemed to be convinced that only medications could address her symptoms. Tr. at 429.

2.    Medical Source Opinions

In May and July 2006, four state agency medical consultants reviewed the medical records and assessed Plaintiff's functional limitations. Psychologist Rob Ronin, M.D., and Debra Price, Ph.D., evaluated Plaintiff's claimed mental impairments in 2006, and both

concluded that her affective and anxiety disorders were not severe impairments because they caused only "mild" restriction of activities of daily living; no difficulty in maintaining social functioning; "mild" difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 235–48, 273–86.  In 2006, Frank Ferrell, M.D., and William Hopkins, M.D., both concluded that Plaintiff was physically capable of lifting 20 pounds occasionally and 10 pounds frequently, standing/walking for about six hours, and sitting for about six hours in an eight-hour day.  Tr. at 249–56, 265–72.  Dr. Ferrell also limited Plaintiff to no more than occasional climbing and frequent balancing, stooping, kneeling, crouching, and crawling.  Tr. at 250–51.

On April 25, 2007, Dr. Salmon opined in a Psychiatric Review Technique Form (PRTF) that Plaintiff met the criteria of Listing 12.04, because her depression caused "moderate" limitation of activities of daily living; "marked" difficulties in maintaining social functioning; "marked" difficulties in concentration, persistence or pace; and four or more episodes of decompensation, each of extended duration.  Tr. at 354, 364.  He also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which he opined that Plaintiff had "moderate" limitations in the ability to understand, remember, and carry out short, simple instructions, and "marked" limitations in all other mental work-related activities.  Tr. at 374–75.

### 3.    Other Evidence

In an undated Function Report submitted in connection with her SSI application, Plaintiff reported that she lived independently in an apartment, and that her daily activities

included watching television, "mov[ing] around," resting, and sleeping. Tr. at 133. She also cared for her personal needs, prepared simple meals, made her bed, cleaned her bathroom, ironed, went outside, sat on her porch, shopped with her mother, read, visited her family members, and attended medical appointments. Tr. at 134–37. Plaintiff complained of difficulty performing various physical activities, as well as memory and concentration problems, but denied having any problems completing tasks, understanding, following directions, or getting along with others. Tr. at 138. She indicated that she could pay attention for "a couple of hours" at a time, finish what she started, follow instructions "very well," and get along with authority figures "pretty well." Tr. at 138–39. She complained of difficulty handling stress and changes in routine. Tr. at 139.

      C.     The Administrative Proceeding

          1.     Plaintiff's Testimony

At the December 2008 administrative hearing, Plaintiff testified that, during her working years, she would work for a little while and then "move on." Tr. at 41. When asked about her treatment for HIV, she indicated she had not been receiving that treatment consistently because, when diagnosed, she had been young, irresponsible, and in denial. Tr. at 29. She indicated that, after AIDS Upstate dropped her from its treatment program, it took her several years to find an organization that was willing to consistently pay for her HIV medications. Tr. at 29. Plaintiff testified she had experienced depression "for years" and that she had been taking medications for depression for a year or two prior to the hearing. Tr. at 33. As to her abilities, she indicated that she could walk 20 to 25 steps at a

time, stand for less than 30 minutes at a time, sit for 45 minutes at a time, and lift no more than five pounds. Tr. at 34–35. She said she could not focus or concentrate and that she found it "very hard" to be in public. Tr. at 35. In describing her daily activities, Plaintiff testified that she grocery-shopped with her mother, read and watched television, dressed and bathed independently, cooked her own meals, washed dishes by hand, "sometimes" made her own bed, and did not do any other housework. Tr. at 36–39.

2.    Vocational Expert's Testimony

Vocational Expert Rock Weldon (VE) testified that Plaintiff's past relevant work (PRW) as a housekeeper, cashier, and inspector were all unskilled and light in exertion. Tr. at 51. He testified that a hypothetical individual who could lift 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours and sit for six hours in an eight-hour day with normal breaks; occasionally climb ladders, ropes, scaffolds, ramps or stairs; and perform simple, routine, repetitive tasks with only occasional interaction with the public, would be able to perform Plaintiff's past work as a housekeeper and inspector, as well as other unskilled light jobs in the national economy. Tr. at 51–52.

3.    The ALJ's Decision

Utilizing the Commissioner's five-step sequential evaluation process, the ALJ evaluated the evidence and concluded that Plaintiff's impairments were not disabling. Tr. at 11–19. At Steps One through Three, the ALJ found that Plaintiff had not performed substantial gainful activity since the alleged onset of disability; that she had severe impairments (HIV, neuropathy, and depression); and that none of her impairments, alone

or in combination, met or equaled the criteria of any listing so as to be presumptively disabling.  Tr. at 13-16.  Next, the ALJ found that Plaintiff's subjective complaints of disabling limitations were not fully credible, and that she had the residual functional capacity (RFC) for limited light work as described to the VE.  Tr. at 16–18.  At Step Four, the ALJ found that Plaintiff was capable of performing her PRW as a housekeeper and inspector.  Tr. at 18–19.  Because Plaintiff could perform her PRW, the ALJ concluded that she was not disabled within the meaning of the Act.  Tr. at 19.

II.    Discussion

In her brief, Plaintiff lists the following reasons she claims that the Commissioner's findings are in error, stated verbatim:

A.    Did the Commissioner apply an improper legal standard by failing to include specific findings as to the degree of limitation in each functional area described in the Psychiatric Review Technique Form?

B.    Did the Commissioner apply an improper legal standard by failing to provide a specific function-by-function assessment of Ms. Cureton's mental capacities at step four of the sequential evaluation?

C.    Did the Commissioner apply an improper legal standard by failing to thoroughly assess Ms. Cureton's credibility?

D.    Did the Commissioner apply an improper legal standard by failing to properly assess opinion evidence from examining psychologist, Donald Salmon?

E.    Are the conclusions of the Commissioner regarding Ms. Cureton's mental capacities supported by substantial evidence?

Pl.'s Br. at 1–2.

The Commissioner counters that the ALJ did not commit reversible legal error and that his findings are supported by substantial evidence.

A.     ALJ Findings

In his March 16, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant has not engaged in substantial gainful activity since February 27, 2006, the application date (20 CFR 416.971 *et seq.*).

2.     The claimant has the following severe impairments: HIV positive, neuropathy and depression (20 CFR 416.921 *et seq.*).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work involving lifting twenty pounds occasionally and ten pounds frequently; involving sitting. standing and walking up to six hours out of an eight hour work-day; and involving occasional climbing of ladders, ropes, scaffolds, ramps or stairs. The occupational base is further eroded such that the claimant is limited to simple, routine, repetitive tasks; and occasional interaction with the public. (20 CFR 416.967(b))

5.     The claimant is capable of performing past relevant work as a housekeeper and inspector. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.     The claimant has not been under a disability, as defined in the Social Security Act, since February 27, 2006, the date the application was filed (20 CFR 416.920(f)).

Tr. at 13, 15, 16, 18, 19.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that, for eligible[1] individuals age 18 or older, benefits shall be available to those who are "under a disability," defined as one who is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A).[2]

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. *See* 20 C.F.R. § 416.920. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. *See id.*

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of

---

[1] Eligibility requirements for SSI focus on a claimant's income and are not at issue here. *See* 42 U.S.C. § 1382(a) (setting out SSI eligibility requirements).

[2] The standards for determining whether an adult claimant is "disabled" for purposes of being entitled to SSI are substantially the same as those for a claimant seeking disability insurance benefits (DIB) under the Act. *See* Frank S. Bloch, BLOCH ON SOCIAL SECURITY, §§ 2.1, 3.3 (2010).

five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1 ("the Listings"); (4) whether such impairment prevents claimant from performing past relevant work (PRW); and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 416.920(a), (b). The claimant bears the burden of establishing his inability to work within the meaning of the Act.

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the

regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3) (applying § 405(g) judicial review provisions to SSI matters).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      C.     Analysis

      Plaintiff raises several challenges regarding the ALJ's application of proper legal standards, claiming that the ALJ did not completely analyze and discuss required criteria in determining whether Plaintiff suffered from a severe, listed impairment, and in his analysis and discussion of specific factors in assessing Plaintiff's RFC.  Plaintiff also claims the ALJ erred in his analysis of the opinion evidence from independent medical examiner Dr. Salmon and in his consideration of Plaintiff's credibility.  Plaintiff claims these errors combine to require remand for additional consideration.  The Commissioner argues that the ALJ's determination is supported by substantial evidence and that there are no legal errors requiring remand.

1.    The ALJ Did Not Sufficiently Evaluate Plaintiff's Claimed Mental Impairment in Considering Her Disability Claim.

a.    The Special Technique

Plaintiff first argues that the ALJ erred because he did not provide findings required by the "special technique" in evaluating her alleged mental impairment of depression and its impact on her ability to work. In evaluating claimed both physical and mental impairments, the Social Security Administration (SSA) follows the framework of the five-step sequential analysis set out above.  When considering mental impairments in adults, the SSA "must follow a special technique at each level in the administrative review process."  20 C.F.R. § 416.920a.  This special technique is set out in 20 C.F.R. § 416.920a(b) through (e) and helps the SSA to "[o]rganize and present [] findings in a clear, concise, and consistent manner[,]" among other things.  20 C.F.R. § 416.920a(a).

The SSA uses the technique at Step Two of the sequential analysis and evaluates the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [claimant] has medically determinable mental impairment(s)," and, if she does, SSA is to document its findings in accordance with subsection (e) of the regulation.  20 C.F.R. § 416.920a(b)(1).  Next, the SSA uses the technique to "rate the degree of functional limitation resulting from the impairment(s) in accordance with [20 C.F.R. § 416.920a(c)] and record [its] findings as set out in [20 C.F.R. § 416.920a(e)]."  20 C.F.R. § 416.920a(b)(2).

The special technique includes the following instructions regarding how the SSA is

to rate the degree of a claimant's functional limitation:

(c)    Rating the degree of functional limitation.

(1)    Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2)    We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3)    We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4)    When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

20 C.F.R. § 416.920a(c).

The SSA uses these ratings of the degree of limitation in specified areas of function to determine the impairment's severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) calls for a finding that the impairments are not severe unless evidence indicates "more than a minimal limitation" in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).

If the claimant's impairments are deemed severe at Step Two of the sequential analysis, the SSA then uses the special technique at Step Three to determine whether a severe impairment meets a Listing. The Commissioner compares the medical findings about the severe impairments and the rating and degree of functional limitation to the criteria of the appropriate listed mental disorder in determining whether the severe impairment meets or equals a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). The functional areas and the rating scale found in 20 C.F.R. § 416.920a(c) correspond to criteria in the listed mental impairments in 20 C.F.R. pt. 404, subpt. P, app. 2, § 12.00 through 12.09. If the SSA finds the claimant does not meet a listed impairment, it moves to Step Four and assesses the claimant's RFC. 20 C.F.R. § 416.920a(d)(3). SSR 96-8p offers guidance in considering the RFC.

Relevant to Plaintiff's first specific challenge, the special technique specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). *The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.*

20 C.F.R. § 416.920a(e)(2) (emphasis added).

> b.    The ALJ Erred By Not Providing Articulation of Findings Required by the Special Technique in Determining Whether She Met Listing 12.04.

The ALJ found Plaintiff had the severe impairments of HIV positive, neuropathy, and depression, but found that Plaintiff's severe impairments or combination of impairments did not meet or medically equal one of the listed impairments. Tr. at 13–18. Plaintiff argues that the ALJ did not properly consider and document his findings regarding whether her depression was a severe impairment that met or medically equaled Listing 12.04, Affective Disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Listing 12.04 provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms, and (B) the symptoms result in at least two of the following: "1. Marked restriction of activities of daily living; 2. Marked difficulties in maintaining social functioning; 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration," or (C) there is a medically documented history of a chronic affective disorder

of "at least 2 years' duration" that has caused more than a minimal limitation of ability to do basic work activities that also satisfy specific additional criteria not at issue here.[3]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

At Step Two of the sequential analysis, the ALJ found Plaintiff had the severe mental impairment of depression, among other things.  Tr. at 13–14.  He noted her symptoms of depression, anxiety, irritability, agitation, hopelessness, and insomnia.  Tr. at 14.  He found that the medical record showed evidence of these symptoms and, viewing the record in the light most favorable to Plaintiff, he found her impairments to be severe, noting the following:

> [T]hese impairments impose more than a minimal affect [sic] in her ability to perform the basic demands of competitive remunerative work-related tasks and they pose more than a slight restriction on her ability to attend to her activities of daily living, to maintain social functioning and to maintain her concentration, persistence and pace, as will be discussed below.

Tr. at 14.  After discussing several other claimed impairments that he found to be not severe, the ALJ then proceeded to Step Three of his sequential analysis to determine whether her severe impairments met or equaled a Listing.

After evaluating Plaintiff's HIV status to determine that it did not meet or medically equal Listing 14.08, the ALJ considered whether Plaintiff's depression was a severe impairment.  That analysis follows in full:

---

[3]To satisfy the requirements of Listing 12.04, a claimant must satisfy the diagnostic requirements (the so-called "A" requirements) and either the "B" or "C" requirements.  The ALJ's finding that Plaintiff satisfied the "A" requirements, but did not satisfy the "C" requirements (Tr. at 15), has not been challenged.

The evidence reveals the claimant has been diagnosed with an affective disorder, which satisfies the diagnostic criteria found in Section 12.00 of Appendix 1. (Exhibit l0F, 13F, 18F, 23F) While severe, this condition is not disabling per se as it is not attended by functional limitations that meet or equal the requirements of Section 12.04, Affective disorders. To satisfy this listing, the claimant must have two marked limitations of function under the Part B criteria (or meet the requirements of the Part C criteria) in at least two of the following areas: activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence and pace and repeated episodes of decompensation of extended duration. In addition, the claimant does not have a medically documented history of a chronic affective disorder of at least two years duration which causes more than a minimal effect on her ability to do basic work activities.

A physician certified by the state agency has reviewed the medical evidence and determined that none of the claimant's impairments, either singly or in combination, medically meet or equal the criteria of any listed impairments. As such, the undersigned Administrative Law Judge finds that none of the claimant's impairments, singly or in combination, medically meet or equal the criteria of any listed impairments described in Appendix 1 of the Regulations (20 C.F.R. Part 404, Subpart P, Appendix 1).

Tr. at 16–17.  The ALJ then considered Plaintiff's RFC at Step 4.  Tr. at 16.

Plaintiff alleges that the ALJ erred because he did not include specific findings regarding Plaintiff's degree of limitation in the four functional areas as expressly required by the SSA's "special technique" for evaluating mental impairments such as depression. Pl.'s Br. at 5–6 (*citing* 20 C.F.R. § 416.920a).  She argues that this omission was not harmless error and requires remand for additional consideration.  The Commissioner concedes that the ALJ "could have been clearer in rating Plaintiff's degree of limitation," but argues that the ALJ's findings implicitly provided sufficient detail as to the degree of limitation.  Alternatively, the Commissioner argues that any failure by the ALJ to set out specifics regarding his rating of the degree of Plaintiff's mental limitations was harmless.

Def.'s Br. at 9–10.  The undersigned agrees with Plaintiff. As Plaintiff notes, 20 C.F.R. §

416.920(e)(2) expressly requires that, in utilizing the special technique, the ALJ's

decision is to "include a special finding as to the degree of limitation in each of the

functional areas described in paragraph (c) of this section."  *Id.*  The ALJ did not include

those required findings.

The Commissioner concedes the ALJ did not expressly include his findings

regarding the functional areas in his decision.  However, he argues that such findings are

implicit, stating:

> [It] is evident that he found [Plaintiff] had "mild" to "moderate" limitations
> (by virtue of the fact he found her depression caused "more than slight"
> limitations, but did not meet the criteria of Listing 12.04, which requires
> "marked" limitations or repeated episodes of decompensation).

Def.'s Br. at 10.

The undersigned disagrees.  As an initial matter, it does not necessarily follow

from the ALJ's decision that he found Plaintiff's functional limits in each category to be

"mild" to "moderate."   The special technique requires the ALJ to rate Plaintiff's

functional limitations as to the functional areas on this five-point scale: "None, mild,

moderate, marked, and extreme."  20 C.F.R. § 416.920a(c)(4).  These same ratings of the

same functional areas are part of the analysis the ALJ must perform in determining

whether Plaintiff's impairments meet or medically equal a Listing.  Listing 12.04B.  The

ALJ properly noted that Listing 12.04 requires findings of "marked" limitations in *two* of

the functional areas, which are the "Section B" criteria in that Listing.  Tr. at 15.  Because

the ALJ found that Plaintiff did not satisfy Listing 12.04's Section B criteria, it is possible

that the ALJ found Plaintiff had only mild or moderate limitations in these areas to be considered in Listing 12.04B. However, it is also possible that the ALJ found Plaintiff had "marked" or "extreme" limitations in one of the functional areas and "none," "mild," or "moderate" in others. Either combination would support the ALJ's findings that Plaintiff's depression was "not attended by functional limitations that meet or equal the requirements of Section 12.04, Affective Disorders." Tr. at 15. That does not suffice to satisfy the regulation's requirements.

To facilitate judicial review, the Act and the Administrative Procedures Act require a decision maker to include "in the text of her decision a statement of the reasons for that decision." *See Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986). Without such a statement of reasons, a reviewing court cannot determine whether the Commissioner based a decision on substantial evidence. *See id.* Without the ALJ's apprising the court of its findings at Step Three, the court cannot properly do that job. *See Davis v. Astrue*, 2:07-231-MBS, 2008 WL 540899 (D.S.C. Feb. 22, 2008). In *Davis*, the court remanded because the ALJ did not adequately set out the applicable listing criteria, did not compare the criteria with the claimant's symptoms, and did not explain her reasons the claimant did not satisfy a Listing. *Id.* The undersigned is of the opinion that the ALJ's decision does not contain implicit findings that could satisfy the express requirements of 20 C.F.R. § 916.1520a and that the ALJ erred.

       c.     The ALJ's Failure to Articulate Findings Is Not Harmless Error.

The Commissioner claims that the ALJ considered Plaintiff's mental limitations later in his decision and "essentially gave credence" to Plaintiff's testimony by finding her RFC was limited to work involving "simple, routine, repetitive tasks," with limited public interaction.  Def.'s Br. at 10–11 (*citing* Tr. at 16).  The undersigned disagrees.

Although there are cases that excuse failure to document findings that a claimant's impairments do not meet or medically equal a listed impairment, those cases involve findings elsewhere in the decision that make it clear the findings the ALJ made regarding listing criteria and that the ALJ's decision is supported by substantial evidence.  *See Harmon v. Astrue*, 9:09-1964-DCN, 2010 WL 3786496, *7 (D.S.C. Sept. 21, 2010) (finding error at Step Three not harmless, noting that a "[h]armless error analysis may be appropriate to supply a missing dispositive finding . . . where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." (internal quotations omitted)).

The undersigned finds the ALJ's omission was not harmless here.  Even reviewing the ALJ's full decision, the court cannot plainly determine the ALJ's findings regarding the functional areas he was to consider and rate in evaluating Plaintiff's depression and whether it met or medically equaled Listing 12.04.  Those specific findings are required in analyzing the Listing, as well as in establishing Plaintiff's RFC.  *See* SSR 96-8p and discussion below.

Although the ALJ set out what the functional areas to be considered were, he did not supply his ratings for those functional areas as required by the special technique and Listing 12.04 itself.  The only nod to documenting his findings at all is to generically state that "[a] physician certified by the state agency" had reviewed the medical evidence and determined that none of Plaintiff's impairments, singly or in combination, met or medically equaled criteria for any listed impairments.  Tr. at 15. He did not cite to the record to indicate which of the several reviews he may have been referencing there.  Tr. at 15–16 (noting state agency physicians determined Plaintiff's impairments did not satisfy listing criteria and, "[a]s such," finding Plaintiff did not satisfy a listing).

The only reports of state-agency consulting medical sources in the record of which the undersigned is aware are the evaluations by Dr. Rob Robin and Dr. Debra Price.  Tr. at 235–48 (Dr. Robin's May 3, 2006 PRTF) and at 273–86 (Dr. Price's July 26, 2006 PRTF).  Both Dr. Robin and Dr. Price considered Plaintiff's records concerning her mental health and determined that, although she had an impairment, it was not severe. *See* Tr. at 235, 273.  Dr. Robin and Dr. Price considered the degree of functional limitation from Plaintiff's mental impairment as required at Step 2 of the sequential analysis.  Both found Plaintiff had "mild" restriction of activities of daily living and "mild" difficulties in maintaining concentration, persistence, or pace, and no difficulties in maintaining social functioning or episodes of decompensation of extended duration.  Tr. at 245, 283.  When finding "none" or "mild" in these areas, SSA regulations indicate

impairments will be rated as not severe, 20 C.F.R. § 416.920a(d)(1), which is apparently what Dr. Robin and Dr. Price did.

The ALJ does not reference Dr. Salmon's evaluation in this discussion, although it is the only other psychiatric evaluation in the record.  As discussed further below, the ALJ discusses Dr. Salmon's opinion briefly in connection with his evaluation of Plaintiff's RFC and affords it "little weight."  Tr. at 17–18.  He again mentions the consulting examiners' opinions in connection with the RFC analysis, indicating only he "carefully considered" them and that they support a finding of not disabled.  Tr. at 18. However, he offers no real discussion of these opinions at all, other than to obliquely note that he accorded them significant weight, although he found Plaintiff to be "somewhat more limited mentally than she was previously assessed to be."  Tr. at 18.

The undersigned cannot agree that the ALJ's omission at Step-Three was remedied by his Step-Four discussion.  Although there may exist record evidence to support the ALJ's findings, that cannot be concluded on this record.  The undersigned recommends remand so that the ALJ can fully articulate his required findings, including his ratings of the functional areas set out in 20 C.F.R. § 404.1620 and in Listing 12.04.

            d.    The Commissioner Should Provide More Detailed Analysis of Plaintiff's RFC.

After finding Plaintiff's depression did not meet Listing 12.04, the ALJ considered her physical and mental RFC.  Plaintiff has not challenged the ALJ's findings regarding her physical RFC, but he argues the ALJ erred in analyzing her mental RFC.  After summarizing the objective evidence regarding Plaintiff's depression and treatment for it,

he found that, "[a]s a result of the claimant's depression, she is limited to work involving simple, routine, repetitive tasks and occasional interaction with the public." Tr. at 17.

Plaintiff argues that the ALJ erred by not providing a more specific function-by-function analysis of her mental RFC, as required by SSR 96-8p. The Commissioner disagrees, arguing that the ALJ's findings were sufficient and supported by substantial evidence.

SSR 96-8p provides the SSA's policy interpretation regarding assessment of a claimant's RFC at Step-Four of the sequential analysis. In pertinent part, the ruling provides:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.154 and 416.945. . . .

SSR 96-8, no. 5. Specific to claims of mental impairments, the Ruling provides:

> *The psychiatric review technique*. The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p (emphasis in original). Plaintiff argues that the ALJ erred in that his assessment of her mental RFC did not satisfy SSR 96-8p's specific requirement of a more

detailed assessment, in which Plaintiff's capacity for the various functions summarized on the PRTF is discussed. Pl.'s Br. at 7. Further, he argues that the ALJ implicitly found Plaintiff had no limits as to any specific functions to have been considered (as listed on the PRTF) that he did not specifically discuss. Def.'s Br. at 14.

These additional assessment items at issue expound upon the analysis of the four functional areas to have been considered at Steps Two and Three. Listing 12.00 catalogs these additional functions to be considered as to all mental listings. Summarized, the considerations regarding a claimant's activities of daily living include consideration of whether the claimant has "serious difficulty performing [the daily living functions] without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.* The discussion of assessment of "social functioning" is expanded to include the claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals . . .," as well as his or her "cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity." *Id.* Specifically regarding work settings, the considerations include assessment of evidence of a claimant's "interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." *Id.* The B criteria of "concentration, persistence, and pace," are further defined as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* Listing 12.00 states that this area of functioning "can be discussed in terms of [the claimant's] ability to work at a consistent pace for acceptable

periods of time and until a task is completed, and . . . to repeat sequences of action to achieve a goal or an objective." *Id.* Finally, the B criteria of "episodes of decompensation" are expanded to include "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Id.* Such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.*

Plaintiff argues that the ALJ should have addressed each of these work activities, pointing out specifically that Dr. Salmon's assessment of her mental RFC provided that detailed information and that the ALJ did not fully discuss these areas and explain why he found otherwise. Pl.'s Br. at 7 (*citing* Dr. Salmon's assessment at 374–75). Plaintiff focuses on the domains of functioning that include ability to make judgments on simple work-related decisions, the ability to interact appropriately with supervisors and co-workers, and the ability to respond appropriately to changes in a routine work setting. Pl.'s Br. at 7.

Plaintiff concedes that no Fourth Circuit case has considered the issue of how much written detail an ALJ's decision must include in analyzing mental impairments at Step Four. He further acknowledges that the only published case from this district of which Plaintiff is aware, *Vo v. Astrue*, 518 F. Supp. 2d 715 (D.S.C. 2007), was remanded

with instruction to perform a function-by-function assessment because the matter was already being remanded for other reasons. He urges the court to adopt the requirement set out by the Fifth Circuit that required each function be explicitly assessed. *See Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). Plaintiff then spends several pages discussing the decision in *Mellon v. Astrue*, 08-2110-MBS-TER, 2009 WL 2777653 (D.S.C. Aug. 10, 2009), in which the court considered this issue, but ruled that specific, written discussion of each function was not necessary. Plaintiff urges a different result here, arguing that *Mellon*'s holding turned on detail found elsewhere in the ALJ's decision—detail he claims is not present here. Pl.'s Br. at 8–10.

Plaintiff claims that, because the ALJ did not include his findings as to the four broad functional areas, it is impossible to infer anything about what the ALJ determined in Step Four concerning tasks related to those functional areas. Further, Plaintiff argues that, although the ALJ's findings regarding Plaintiff's ability to perform simple tasks and interact with the public, it is unclear on what evidence he based those findings.

Here, the ALJ did not perform the analysis Plaintiff urges SSR 96-8p requires. The court recommends that, on remand, the ALJ be required to provide the detailed function-by-function analysis. As in *Vo,* the court has recommended remand for other reasons and further recommends the ALJ should elaborate on his RFC as contemplated in SSR 96-8p. SSR 96-8p ("The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the

PRTF."). Rather than ask the court to "infer" that no discussion means that the court found no limitation, the ALJ should elaborate on his findings and reasons for the findings. Additional analysis will aid the court in determining whether the ALJ's decision is supported by substantial evidence. *See Lowe v. Astrue*, C/A No. 3:07-1766-RBH, 2008 WL 4449940 (D.S.C. Sept. 26, 2008) (remanding for consideration of RFC in accordance with SSR 96-8p). The undersigned stresses that this recommendation should not be construed as suggesting that a written, function-by-function discussion is always required by SSR 96-8p.

> 2.    The ALJ Should Also Reconsider All Medical Opinion Evidence on Remand.

Plaintiff also argues the ALJ erred by improperly examining the opinion of Dr. Salmon, an independent medical examiner who examined Plaintiff on April 25, 2007 at the request of her counsel and found she had "marked" limitations in social functioning and concentration, persistence, and pace, and met the requirements of Listing 12.04, making her unable to work. *See* Tr. at 364–65. The ALJ explained that he was discounting Dr. Salmon's opinion because he based his findings on Plaintiff's self-reported symptoms, his findings were conclusory, against the weight of the record as a whole, and were not supported by specific record evidence. Tr. at 17–18. He indicated that Plaintiff's testimony of her activities contradicted Dr. Salmon's conclusions. Tr. at 18. The ALJ concluded his findings regarding Dr. Salmon's opinion by stating that it had "performed at the request of the claimant's representative[,]" and was "more akin to an advocacy opinion." Tr. at 18. Citing an unpublished First Circuit case regarding

advocacy opinions, the ALJ concluded that he "considered it," but accorded it "little weight."  Tr. at 18.

Plaintiff specifically challenges the ALJ's discounting Dr. Salmon's opinion on the ground that it was "akin to an advocacy opinion."  Pl.'s Br. at 14.  The Commissioner does not disagree with that general proposition, but counters that, by the same token, an ALJ is not required to "accept" such opinions, either.  Def.'s Br. at 13.  Neither party cites any Fourth Circuit cases on this matter.

The mere fact that a claimant's representative or attorney arranged to have a medical examination performed should not determine the consideration the ALJ gives that opinion.  Rather, the ALJ should consider the nonexclusive list of factors set out in 20 C.F.R. § 404.1527:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.  *See Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).   In this matter, the undersigned finds that ALJ provided some appropriate reasons for discounting Dr. Salmon's opinion, including his finding that Dr. Salmon's conclusions were not supported by Plaintiff's own testimony regarding her activities.  Tr. at 18.  Nonetheless, Dr. Salmon's opinion includes specific findings regarding Plaintiff's capacity in the functional areas that the special technique required the ALJ to consider, as well as a function-by-function analysis of each category set out in the PRTF that should be considered.   Accordingly, the undersigned recommends that, when the ALJ reconsiders this matter on remand, he again examine Dr. Salmon's opinion, as well as the

opinions of the state agency physicians and other evidence to provide his own detailed ratings and findings regarding the functional areas and a function-by-function analysis. In considering Dr. Salmon's opinion, the ALJ should not be swayed by the fact that Plaintiff's counsel was involved in having Dr. Salmon perform the evaluation.   In undertaking the more thorough analysis that the regulations require, the ALJ can provide more detailed findings that will permit the reviewing court to conduct its job of reviewing those findings to determine whether they are supported by substantial record evidence.

> 3.    The ALJ Did Not Err in His Evaluation of Plaintiff's Subjective Complaints.

Finally, Plaintiff argues that the ALJ did not provide specific findings regarding her subjective complaints.   Pl.'s Br. at 11–13.   SSR 96-7p requires that, prior to considering Plaintiff's subjective complaints, the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Then, the ALJ is to consider the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of her subjective complaints, including pain.   *See* SSR 96-7p; *see also* 20 C.F.R. § 416.929; *Craig v. Chater*, 76 F.3d 585, 591–96 (4th Cir. 1996).   The ALJ need not accept Plaintiff's complaints on their face. If he rejects a claimant's testimony about her pain or physical condition, the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (*quoting Smith v. Schweiker*, 719

F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Plaintiff concedes that the ALJ properly completed the first prong of this analysis in finding that her objective medical evidence could support her subjective complaints. However, Plaintiff alleges the ALJ erred in his review of her subjective complaints, claiming that the ALJ's reasons for discounting her credibility were not appropriate. Pl.'s Br. at 11–13. The Commissioner counters that the ALJ properly considered Plaintiff's subjective complaints in accordance with SSR 96-7p. Def.'s Br. at 15–17.

As the Commissioner correctly pointed out, the ALJ considered the effectiveness of Plaintiff's treatments and that she frequently did not comply with recommended treatment. *See* Tr. at 17. Plaintiff argues the ALJ improperly criticized her for not participating in counseling because she went to the Mental Health Center and took medications. She argues that the record contained no indication that counseling had been advised. Pl.'s Br. at 12. The Commissioner, though, points to several records that recommended that Plaintiff seek counseling. Tr. at 401, 429. Further, the ALJ pointed out Plaintiff's compliance with HIV treatment was so sporadic she became unable to receive treatment at the AIDS Upstate Clinic. Tr. at 17. The ALJ properly considered those factors. *See Mickles*, 29 F.3d at 921.

Plaintiff also argues that the ALJ improperly considered her normal daily activities, claiming they do not demonstrate that she would be capable of working a full week. Pl.'s Br. at 12–13. The undersigned agrees with the Commissioner that credibility determinations may include consideration of a claimant's relatively non-strenuous activities like those in which Plaintiff engages. *See, e.g., Johnson*, 434 F.3d at 658 (finding ALJ logically reasoned that claimant's ability to attend church, read books, watch television, clean the house, wash clothes, visit relatives, feed pets, cook, manage finances, perform stretches recommended by chiropractor, and lift ten pounds were inconsistent with allegations of pain and inability to perform regular movements like bending, sitting, walking, grasping, or maintaining attention); and *Mickles*, 29 F.3d at 921 (finding ability to do a "wide range of housework" may support a finding that claimant's impairments are not of disabling severity).

Plaintiff also argues that the ALJ should have considered her "inability to keep a job" in evaluating her credibility. Pl.'s Br. at 16. However, work history is one of several factors an ALJ may consider in determining credibility. The undersigned does not find that the ALJ erred in evaluating Plaintiff's credibility.

III.    Conclusion and Recommendation

Based upon the foregoing, the undersigned cannot conclude that the ALJ's decision to deny benefits is free from error or that it is supported by substantial evidence. Therefore, it is recommended that the Commissioner's decision be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for additional consideration as set out herein.

IT IS SO RECOMMENDED.

January 28, 2011                          Shiva V. Hodges
Florence, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**